# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of

E.S.,
          Minor Child

JASON SCOTT,
          Appellant,

    v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

          Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 71464-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 17, 2014

2014 NOV 17 AM 10: 55
COURT OF APPEALS DIV I
STATE OF WASHINGTON

LAU, J. — Jason Scott appeals the trial court's order terminating his parental rights to his daughter ES. Scott argues that the record fails to support the trial court's findings that (1) the Department of Social and Health Services expressly and understandably offered or provided all necessary and reasonably available services capable of correcting his parental deficiencies within the foreseeable future and (2) the continuation of the parent-child relationship clearly diminishes ES's prospects for early integration into a stable and permanent home. Scott also claims the order of

termination must be reversed because the Department did not investigate permanency options for ES other than adoption. Because substantial evidence supports the trial court's findings and because those findings support the conclusions of law terminating Scott's parental rights, we affirm.

## FACTS

Scott is the father of ES, who was born on May 18, 2003. On March 29, 2004, Scott was convicted of one count of rape of a child in the third degree—the victim was ES's mother. Scott's judgment and sentence prohibited him from having any contact with ES without approval of his community corrections officer and sexual deviancy treatment specialist, though he was permitted to have pictures of ES. On December 10, 2009, Scott was convicted of failure to register as a sex offender. Scott's judgment and sentence again prohibited him from having contact with any minors without the supervision of a responsible adult with knowledge of his conviction.

ES has two younger half-siblings who are not Scott's biological children. ES and her siblings resided with their mother and maternal grandparents, where they suffered tremendous abuse and neglect. During this time, ES began to parent her younger siblings. The Department removed ES and her siblings from the care of their mother on March 21, 2012. At the time, Scott was incarcerated pursuant to an October 19, 2011 conviction for delivery of methamphetamine. The dependency court entered dependency and dispositional orders as to both parents. Scott's dispositional order did not order Scott to participate in any particular remedial services. Instead, it provided that the Department would "assess" Scott for services. At no point during the dependency proceedings did the dependency court order Scott to participate in

services. Scott's dispositional order also provided that Scott could "send letters/cards to the assigned social worker to pass on to the child if appropriate" and that the social worker and court-appointed special advocate (CASA) could authorize Scott to have telephone contact with ES.

Micah Kurtz became ES's social worker in June 2012. In February 2013, Kurtz sent Scott a letter explaining that Scott was required to participate in a psychological evaluation with a parenting component, a parenting assessment, chemical dependency evaluation, and urinalysis testing. Kurtz asked Scott to investigate whether he could do any of these services while incarcerated. Scott participated in chemical dependency treatment while incarcerated, as well as a stress and anger management program. However, Scott never contacted Kurtz to inform him of any services he was participating in.

While incarcerated, Scott sent ES approximately four to six letters, asking her questions about herself such as her favorite colors and favorite television shows. ES wrote Scott one letter in return. For ES's birthday, Scott drew a SpongeBob SquarePants card and made her a beaded bracelet in her favorite colors. Scott did not ask Kurtz if he could have any additional contact with ES, such as telephone calls.

During the dependency proceedings, ES and her siblings were placed together in a foster home. Kurtz investigated relative placement options for ES, including Scott's mother, grandmother, and aunt. However, none of Scott's family members were willing to also care for ES's siblings. Both Kurtz and the CASA felt strongly that it was in ES's best interest to be placed with her siblings because the three children had never been separated and "they really were the only three people that were really there for each

other" during their grim early years. Report of Proceedings (Nov. 25, 2013) (RP) at 95. Scott was aware that ES had two siblings and stated, "I honestly do think it would be good for [ES] to be with her brother and sister." RP at 32. Scott admitted he did not intend to care for ES's siblings himself.

On June 21, 2013, the State filed a petition to terminate Scott's parental rights as to ES. The trial court held a termination trial on November 25, 2013. Scott testified by telephone from Stafford Creek Corrections Center. Scott stated that he had been incarcerated for approximately half of ES's life and that she had never lived with him full time. When asked if he wanted ES to live with him full time after he was released, Scott responded, "Wow, I wasn't expecting that question." RP at 15. He went on to say that he would have too much "stuff on [his] plate" for at least eight to twelve months after his release to be capable of parenting ES. RP at 15-16. Scott's classification counselor testified that Scott's earliest release date was in January 2014.

On January 3, 2014, the trial court entered findings of fact and conclusions of law and an order terminating Scott's parental rights. Scott appeals.

## ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

-4-

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the future. . . . ; [and]

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If a parent is incarcerated, the court must also

consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1)(f). This language was added to subsection (1)(f) effective July 28, 2013. RCW 13.34.145(5)(b), referenced in RCW 13.34.180(1)(f), is a new provision that also became effective July 28, 2013. It provides a nonexhaustive list of factors that the trial court may consider in determining whether an incarcerated parent "maintains a meaningful role in his or her child's life," as well as various types of barriers that incarcerated parents may face in maintaining such a role:

The court's assessment of whether a parent who is incarcerated maintains a meaningful role in the child's life may include consideration of the following:

(i) The parent's expressions or acts of manifesting concern for the child, such as letters, telephone calls, visits, and other forms of communication with the child;

(ii) The parent's efforts to communicate and work with the department or supervising agency or other individuals for the purpose of complying with the service plan and repairing, maintaining, or building the parent-child relationship;

> (iii) A positive response by the parent to the reasonable efforts of the department or the supervising agency;
>
> (iv) Information provided by individuals or agencies in a reasonable position to assist the court in making this assessment, including but not limited to the parent's attorney, correctional and mental health personnel, or other individuals providing services to the parent;
>
> (v) Limitations in the parent's access to family support programs, therapeutic services, and visiting opportunities, restrictions to telephone and mail services, inability to participate in foster care planning meetings, and difficulty accessing lawyers and participating meaningfully in court proceedings; and
>
> (vi) Whether the continued involvement of the parent in the child's life is in the child's best interest.

RCW 13.34.145(5)(b). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(2).

Findings of fact must be supported by substantial evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

Necessary and Reasonable Services

To satisfy RCW 13.34.180(1)(d), the Department must show that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." A service is necessary within the meaning of the statute if it is needed to address a condition that precludes reunification of the parent

and child. In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The services offered must be individually tailored to a parent's specific needs. In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). However, even if the Department fails to offer or provide necessary services, this element may still be met if there is evidence in the record from which the trial court could have concluded that such services would not have remedied parental deficiencies "in the 'foreseeable future.'" In re Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983). The Department is not required to offer or provide services that would be futile. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

Scott argues that the trial court erred in finding that the Department offered all necessary or reasonable services because the dependency court never expressly ordered him to participate in services. He asserts that RCW 13.34.180(1)(d), by definition, requires such services to be ordered by the court. Scott is mistaken. RCW 13.34.180(1)(d) requires the Department to show "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." (Emphasis added.) It is well settled that RCW 13.34.180(1)(d) requires the Department to offer or provide all necessary services, whether court-ordered or not, that are "reasonably available" and "capable of correcting the parental deficiencies within the foreseeable future." Nothing in the statute requires that the services the Department must offer be set forth in a court order. In fact, to hold

otherwise could create an untenable situation in which the trial court could not find a service to be necessary because the dependency court had declined to order it.

Scott further contends that the Department did not "expressly and understandably" offer services because the Department's failure to seek a court order "directly resulted in confusion and misunderstanding." Br. of Appellant at 12. The record does not support this claim. Scott testified that he received a letter from Kurtz requiring him to participate in "a chemical dependency evaluation, follow-up treatment . . . a psychological evaluation . . . a parenting program, and . . . a mental health evaluation/psychological treatment." RP at 53. He went on to testify that he had done everything Kurtz had asked him to do that could be accomplished while incarcerated. There is no evidence that Scott misunderstood what he had to do in order to reunify with ES.

Scott also contends that because Kurtz never interviewed him personally or collaborated with him in developing a service plan, the services Kurtz recommended were not tailored to his specific needs. But Kurtz testified that he was familiar with Scott's criminal and parenting history and recommended services based on his assessment of Scott's needs. Because Scott was incarcerated for delivery of methamphetamines and admitted to a history of drug use, Kurtz recommended Scott participate in a chemical dependency evaluation and treatment. Because Scott had never parented ES, Kurtz recommended Scott undergo a parenting assessment. And because Scott had been convicted of rape of a child in the third degree against ES's mother and ES was approaching her teenage years, Kurtz recommended Scott undergo a psychological evaluation. Scott does not explain how Kurtz's assessment was

inadequate or what additional services he would have suggested had Kurtz conferred with him in person.

Finally, Scott challenges the trial court's finding of fact 2.9, which provided: "Under the Hall analysis, a psychological evaluation and any recommendations from such an evaluation would not have corrected Mr. Scott's parental deficiencies of absence and lack of parenting skills within the foreseeable future as viewed by [ES]." Scott asserts, without explanation, that if the State had more thoroughly investigated whether a psychological evaluation could be performed in prison, he would have been able to correct his parental deficiencies in the near future. But Scott does not challenge the trial court's finding of fact 2.8, which provided:

> He was not able to participate in a psychological evaluation and although the Department did not explore sending a psychologist to prison to undertake the evaluation, it is doubtful that the parenting component (observation of Mr. Scott parenting [ES]) could have taken place or been valid in such an artificial setting (prison) after Mr. Scott's prolonged absence from [ES] and his even longer absence from being a parent to her. Mr. Scott has never really parented [ES].

We therefore accept the trial court's finding that a psychological evaluation would have been futile as a verity. Additionally, the trial court found, "There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." While Scott assigns error to this finding, he does not support this challenge with any argument in his opening brief. Where a party assigns error to a finding but presents no argument in their opening brief, that assignment of error is waived. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). And there was ample evidence to support this finding. At the time of the termination trial, ES had been out of the care of a parent for more than 18 months. Scott testified that he would not be

prepared to even try parenting ES for at least an additional 8 to 12 months. The trial court noted that this amount of time was "an eternity for a ten year old." RP (Nov. 26, 2013) at 169. Because no service would have enabled ES to be placed with Scott in the near future, the trial court did not err.

Continuation of the Parent-Child Relationship

Scott contends that the State did not prove the factor set forth in RCW 13.34.180(1)(f) because the trial court did not consider whether the Department made "reasonable efforts" and whether he maintained a meaningful role in ES's life, as required by RCW 13.34.180(1)(f).[1] In support, Scott cites our recent decision in In re Dependency of A.M.M., ___ Wn. App. ___, 332 P.3d 500 (2014). In A.M.M., this court held that the State failed to meet its burden of proof as to RCW 13.34.180(1)(f) because there was no evidence in the record that the trial court considered the 2013 amendments to RCW 13.34.180(1)(f) that were in effect at the time of the trial court's ruling. A.M.M., 332 P.3d at 506.

But here, unlike in A.M.M., it is clear the trial court was aware of the amended legislation and made the required findings. During closing argument, the State ensured that the trial court had a copy of the 2013 amendments and specifically applied the required factors to Scott's case. The State argued that Kurtz had recommended

---

[1] The State correctly notes that Scott failed to assign error to the trial court's finding of fact 2.15, which states, "Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." Scott subsequently moved to file an additional assignment of error. But because Scott argued in his opening brief that the State failed to prove RCW 13.34.180(1)(f), we view this as a technical oversight on the part of appellate counsel. The State had a full and fair opportunity to respond to Scott's challenge on the merits, and it did so. We grant Scott's motion to assign error to finding of fact 2.15.

appropriate services for Scott but that Scott was not able to access those services due to his incarceration. The State also argued that Scott failed to maintain a meaningful role in ES's life based on RCW 13.34.145(5)(b)(i) and (ii) because Scott made minimal efforts to maintain contact with ES or to keep Kurtz apprised of his progress in services. After closing argument, the trial court stated it would rule the following day in order to have "time to review...the new statute, which I am not familiar with until today." RP at 161. Findings of fact 2.8 and 2.13 demonstrate that the trial court considered whether the Department made "reasonable efforts" and whether Scott maintained a meaningful role in ES's life:

> 2.8 He was not able to participate in a psychological evaluation and although the Department did not explore sending a psychologist to prison to undertake the evaluation, it is doubtful that the parenting component (observation of Mr. Scott parenting [ES]) could have taken place or been valid in such an artificial setting (prison) after Mr. Scott's prolonged absence from [ES] and his even longer absence from being a parent to her. Mr. Scott has never really parented [ES].
>
> . . . .
>
> 2.13 Mr. Scott remains incarcerated. He has never provided care for [ES] or established a relationship with her. Mr. Scott has written to [ES] 4-6 letters. He has sent her a birthday card and a handmade gift. He was aware that he was not limited in writing to [ES]. Mr. Scott acknowledged the entry of an order (Exhibit 1) that enabled him a path to have telephone calls with [ES]. He never requested a telephone call or visit from [ES]. Since then, he has not contacted her or DSHS, nor responded to DSHS' attempts to contact him.

This case is distinguishable from A.M.M., and the State met its burden under RCW 13.34.180(1)(f).

Consideration of Guardianship

Scott contends that the order of termination should be reversed because the Department did not investigate permanency options for ES other than adoption. In

-11-

support of his claim, Scott cites In re Welfare of R.H., 176 Wn. App. 419, 309 P.3d 620 (2013) and RCW 13.34.180(5).

In R.H., prior to the termination trial, the children's aunt was identified as a potential guardianship placement. The trial court denied the father's motion to continue the termination trial in order for the Department to complete a home study for the aunt. Division Two of this court held that the trial court erred because "an identified guardianship" is "material to the trial court's finding that the State proved that continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." R.H., 176 Wn. App. at 423. However, while ES had relatives that were willing to care for her, Kurtz testified that none of ES's relatives were willing to become her guardian. As such, R.H. is distinguishable because there was no "identified guardianship" for ES.

RCW 13.34.180(5), which became effective July 28, 2013, provides:

> When a parent has been sentenced to a long-term incarceration and has maintained a meaningful role in the child's life considering the factors provided in RCW 13.34.145(5)(b), and it is in the best interest of the child, the department should consider a permanent placement that allows the parent to maintain a relationship with his or her child, such as, but not limited to, a guardianship pursuant to chapter 13.36 RCW.

The State argues that RCW 13.34.180(5) does not apply here because Scott was due to be released within a few months and therefore not "sentenced to long-term incarceration." The State also argues that because the statute provides that the Department "should" consider other permanency options, it is directive, not mandatory, and cannot be grounds for reversal of a termination order. We need not address these issues because the record is clear the Department discharged its responsibility under

this statute. Kurtz appropriately considered a placement with Scott's relatives that presumably would have allowed him to maintain a relationship with ES. However, Kurtz ultimately determined that such a placement was not in ES's best interest because it would have separated her from her siblings.

We affirm the trial court's order terminating Scott's parental rights to ES.

WE CONCUR: